## BROWN *et als. v.* '49 AND '56 QUARTZ MINING COMPANY.

THE first locator of a quartz lode is not confined simply to the solid quartz actually embodied in the bed rock, but is entitled to the loose quartz rock and decomposed material which were once a part of the lode, and are now detached, so far as the general formation of the ledge can be traced.

The right of the quartz miner comes from his appropriation; and whenever his claim is defined, there is no reason in the nature of things, why the appropriation may not as well take effect upon quartz in a decomposed state as any other sort, or why the condition to which natural causes may have reduced the rock, should give character to the title of the locator.

The only question of fact in this case being, whether the quartz rock—parted or not from its original connection—was a portion of the same quartz lode or claim taken up by defendant; it was not important whether the rock was upon or beneath the surface, or what its condition, provided it were a part of such lode or claim.

In cases of this kind, the custom of miners is entitled to great, if not controlling weight.

Under certain circumstances, proof of the custom in other districts may be proper—at least, this Court is not satisfied to the contrary. But in this case, the admission of such testimony, if error, was immaterial, as the case was tried by the Court, and the judgment placed on independent ground, upon which it can stand.

APPEAL from the Fifteenth District.

The suit was for the value of the gold alleged to have been taken by defendants, from the claim of plaintiffs, and converted to their own use. The complaint averred continuous trespasses by defendants upon plaintiffs' claims—the trespasses consisting in removing sluice-boxes, filling up ditches, and taking out the gold on the claims. Damages were asked in the sum of $60,500, and, also, an injunction, which was granted, and subsequently, before the hearing, dissolved.

The recorded notice of the quartz claim of respondents is as follows:

" Notice is hereby given, that we, the undersigned, under the name and title of the '49 and '56 Quartz Mining Company, have this four teenth day of November, A. D. 1856, claimed, and by virtue of these presents do claim, ten (10) claims of one hundred and fifty (150) feet each, on the quartz lead, known as the Rich Gulch Quartz Lead, situated near Yankee Hill, in Oregon township, and county of Butte— said claims commencing at Turner, White & Co.'s claims, (known as the Virgin Quartz Mining Company) running thence in a southerly direction fifteen hundred (1500) feet, comprising all the spurs and branches of said lead."

There was much conflicting evidence as to whether, by the custom of miners in different districts, the loose, detached quartz rock belonged to the locator of the lead.

The case was tried before the Court by consent of parties, and judgment rendered dismissing the action. The facts sufficiently appear in the opinion. Plaintiffs appeal.

*Jos. E. N. Lewis,* for Appellants.

1. The judgment of the Court below is not warranted by the issues found. The Court cannot go outside of these issues, and look into the evidence to support a judgment not warranted by the facts found. (Pr. Act, sec. 180; *Hoagland* v. *Clary,* 2 Cal. 474; Id. 305; *Estell* v. *Chenery,* 3 Id. 467; *Pearce* v. *Burns,* 22 Mo. 577, 582.) The findings extend appellants' claims back to the "quartz ledge," and this is defined by the Court to be, "a stratum of quartz rock 'running in a seam of the bed rock along the face of the hill, in some places showing above the surface of the bed rock, in some places above the bed rock, but covered with surface earth, and in other places dipping entirely beneath the bed rock.'" Hence the claims extended to the bed rock that in-

11

cased the stratum of quartz rock constituting respondents' lead, and embraces the gold within the dirt or quartz rock that had fallen from the " mother ledge."

Again : respondent is a corporation formed to mine in quartz rock, and could not embark in any other species of mining. (2 Kent, 299 ; *Bank of Augusta* v. *Este,* 13 Vt. 587.)

2. The location of defendants is limited to the quartz ledge—" its spurs and branches"—as this was all they intended to take up, according to their notice, and their rights are governed by this intent. (9 Cal. 237, 589 ; 2 Bl. Com. 258 ; *Ropps* v. *Barker,* 4 Pick. 238, 242.)

3. The respondents cannot claim the gold in the dirt or quartz rock broken off in the lapse of time from the ledge, unless it be appurtenant or incident to the ledge, which cannot be. Mining ground from half a foot to twenty-five feet from a ledge, is not an incident to the ledge—it is not necessary to the working of the ledge, as the Court finds. There being no law making this loose quartz rock or gold an incident of the ledge, and it not necessarily being such, it can be so an incident only by grant, prescription or custom, neither of which is found by the Court. (2 Starkie's Ev. 305 ; Bac. Ab. title Common, 260.)

4. The evidence as to the custom in other mining districts to claim certain land around the ledge, was not competent. (*More* v. *Wood,* 4 T. R. 157.)

*P. A. McRae,* also for Appellants.

The right of respondents to the mining ground in controversy seems to be based upon the fact that it contains disintegrated quartz rock, which, by the decomposing action of the atmosphere, during ages past, had gradually crumbled and fallen from the edge and mixed with the soil upon the surface of the hill below.

The adoption of this theory would throw our mining *interests into* chaotic confusion. It is now a generally received and well established fact, that quartz rock is the matrix of gold, and that all the gold that the placer mines contain, has in the process of time, been given out from quartz leads.

If the quartz miner may pursue the debris ten or twenty feet beyond the boundaries of his ledge, may he not go further, and render placer mining a secondary or contingent *interest, subservient to his superior* rights, and overthrow the principle laid down in the case of *Bear River Co.* v. *York Mining Co.* (8 Cal. 334) that the object of the prime

owner in leaving the mines open to the multitude, was to extend the bounty in the minerals to the greatest number?

A right in a mine is, by common law, and by the mining laws of Spain and Mexico, a corporeal and local interest, with specific boundaries. In Halleck's Mining Laws of Spain and Mexico, 29, this law is specifically laid down by decree—and the same is also recognized by this Court in the case of *Jones* v. *Jackson*, (9 Cal. 237) where it is held that to hold ground to deposit tailings or pay dirt upon, requires something more than mere notice—the intention to occupy the particular ground must be made manifest by specific acts.

All mining rights under our system accrue by priority of possession or occupation, and without fixed boundaries, there can be no identity of mining property. Indeed, it is difficult to conceive of a hypothesis by which the quartz miner may give superficial boundaries to his claim, without encroaching upon the vested rights of the placer miner. The rains of each succeeding winter carry, in their floods, millions of our gold from the hills to the placers, and from the placers to the rivers—and down the rivers with the shifting sands to the plains below—and who can follow it?

The errors upon the record in this case, in the ruling of the Court upon points of evidence, are sufficient of themselves to reverse the judgment. We rely mainly, however, upon the facts as found by the Court below, for a judgment in our favor.

*McConnell & Garber,* also for Appellants.

1. The quartz miner locates "leads" or "veins." The working of the soil not being one of his objects, he does not locate the soil, as is the case with the placer miner. A "lead" or "vein" of mineral rock is an accurately defined and easily ascertained thing. (See Ure's Dic. Arts, Manufactures and Mines, vol. 2, pp. 166, 167.) So with the terms "spur" and "feeder," used among the quartz miners of this State—the former meaning a lateral branch from the main lead, not returning to it, but losing itself in the surrounding soil, and diminishing the dimensions of the main ledge by its own breadth; the latter meaning a small vein starting from some distant point, running into the main lead, and enlarging it to the extent of its own breadth. The phrase "float ore," is used to distinguish those isolated masses of ore or mineral which are separated from the regular leads, and correspond with the term "masses," as found in the books. The primary condi-

tion of all minerals is in "leads," but the convulsions of the world have produced what are now termed "masses," "lodes," "nests," etc., all separate and distinct things; and in fixing the rights of parties, we must look to this present state of the mineral.

The Court below decided that respondents were entitled to the gold taken from the disputed ground, because the rock from which it was taken was part of the quartz lead itself; and this conclusion is reached on the theory that the upper portion of the lead had, at some prior time, broken off and fallen down the hill. But this is no practical, reasonable rule. The rights of the parties cannot be made to depend on the locality of this rock a thousand years ago.

This quartz rock in dispute was found within the limits of plaintiffs' placer claim, and corresponds with those deposits called, by Dr. Ure, "masses," or "nests." It was not a part of the lead at the date of defendants' location, and hence such location did not, *ex vi termini,* include it. Nor can it be so included, except by some special rule of law, founded on peculiar reasons, not applicable to the acquisition of property in the usual modes. But there is no such rule. The prior locator gets what he, *eo nomine,* locates, and its natural appurtenances, no more.

2. What are these "appurtenances?" The right to go upon circumjacent land, so far as necessity requires, and there dig and make excavations, in order to reach the lead, is one. The quartz miner may sink shafts on adjoining land to reach the "dips" of his lead. But this is a *mere easement,* or privilege, and is not an interest in the soil. Besides, in this case, the disputed ground is on the side of the lead opposite the dips, and hence the right referred to as appurtenant has no application.

Nor can this surrounding earth and rock be claimed on the doctrine of right of support, because such right, as an incident to property, has relation to the purposes for which the property is holden; and as the object of the quartz miner is to tear down and destroy and work his lead, he cannot object to the acts of others tending to this same object. Further, this right is also a mere easement.

We conclude, therefore, that the right to the disputed rock did not pass as part of the ledge, nor as an incident thereto, and hence did not pass at all. The Spanish Government have settled the rule as we claim it. (Halleck's Mining Law of Spain and Mexico, 29, art. 29 of Ordinance of 1563.)

*Monson & Sunderland,* for Respondents.

1. The defendants' claim is prior in date, and covers the dips, spurs and branches of the lode.

2. The lode itself belonging to defendants, the quartz rock detached from it, and lying contiguous thereto, must likewise belong to defendants. It is the quartz and the gold contained therein, and not the solid mass imbedded in the different formations of granite and other rock, which are taken up by the quartz miner.

The fallen portion of the ledge was embraced by our notice. It is shown by the evidence, and is found as a fact by the Court, that the quartz ledge had, in several places, cropped above the surface. At the particular spot in question, it had fallen over. It is not contended by appellants that this rock, which we claimed and worked, was not originally part and parcel of the solid ledge; but they say, inasmuch as it had fallen over, it was not embraced by our notice.

The word ledge or lead embraces it. The fallen portion was as much the ledge as that embodied in the bed rock.

3. The gold was all "quartz gold," and was found mostly in the quartz and none in the surface earth, and consequently followed the quartz itself, as to its ownership. The gold we took was quartz gold; so shown by the evidence, and so found by the Court. In its findings the Court say: "All the gold bore the rough, scraggled appearance of quartz gold." We took it from the quartz ledge—from that portion of it which had fallen over. The evidence shows, that wherever the ledge comes to the surface, there is more or less decomposed quartz. This belongs to us. It is not contended that it does not, yet it is not particularly specified in our notice. It had become, from the same causes, as much detached from the solid ledge as that portion which had fallen over, and yet, it is admitted that it was embraced by our notice. The rock, from which we took the gold in question, was part and parcel of the ledge—of the same thickness, and as easily traced. Its character had not changed, merely because it had fallen over. It had not become separated from the ledge and lost; the evidence shows it had not, and the Court finds it had not. It had fallen, but still it hung and remained attached to the solid ledge, as much so as the branch of a tree, which from the effects of a storm has fallen over and partially broken off.

It is said that the respondents did not know of this fallen portion of the ledge at the time they posted their notice. It may be true; but how does this assist appellants? In taking up a ledge, parties are

often ignorant of its condition and course. The evidence shows that a ledge often changes its course—takes a jump off five, ten or fifteen feet. Sometimes it divides ; yet by the decisions of this Court we are entitled to it. (*Johnson* v. *Parks*, 10 Cal. 446.)

That respondents intended to take up everything belonging to the ledge, is clearly shown by their notice. It reads : " The ledge with all its spurs and branches." If the word "ledge" does not include the fallen portion of the ledge, then the word "spur" does. Again, the respondents took up the " ledge and all its branches." If the word " ledge " does not embrace the fallen portion of it, the word " branches" does. It was something that had shooted out from the bed-rock.

4. The quartz is the matrix, and the gold the offspring or product, and as the fruit belongs to the owner of the tree, or the grain to the owner of the soil on which it is grown, so the gold goes with the quartz, and both belong to the same party.

5. The custom of miners has established a rule, and that rule gives defendants the detached quartz and gold therein. But it is said that we cannot refer to the evidence establishing this custom, because the Judge did not find it as a fact. Admit that he has not, have the appellants been injured by it ? Where the evidence conclusively establishes that the verdict must be the same if sent back, the Court will not disturb it.

The Court finds that we were the prior locators ; that we did not work beyond the limits of our ledge ; that this fallen rock belonged to us, and was embraced by our notice ; and that the gold we took was quartz gold. A finding of a Judge will be treated precisely as this Court would treat the verdict of a jury. (*Mann* v. *Witbeck*, 17 Barb. 388 ; *Hoppe* v. *Robb*, 1 Cal. 373.)

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. and COPE, J. concurring.

The question in this case, involving plaintiffs' title to recover, has been discussed by the counsel for the appellants with a great deal of scientific learning and with much ingenuity. The facts are, that the defendants, a corporation, in November, 1856, located and recorded the claims, covering a part of a quartz lode now in their possession. The defendants made some permanent and expensive improvements— a mill, tunnels, roads, etc. Subsequently to this, the plaintiffs took up four surface or hill-side claims, by which they claimed the whole of the

hill-side, from the ravine to the quartz lode held by defendants. The plaintiffs commenced working their claims near the ravine, and worked up hill, until they approached within twenty or twenty-five feet of the solid ledge, worked by the defendants. They were stopped by defendants, who claimed the ownership of the ground above the point thus worked by plaintiffs. At the point approached by plaintiffs, the ledge had cropped above the surface or bed rock, and had fallen down the hill—but along the ledge the fallen masses remained in contact with the solid ledge. As the distance from the solid ledge increased, the blocks of detached rock became smaller, and the interstices between the blocks became greater, and the quartz itself more decomposed. The whole of this outcropping was covered with red earth, which also filled the interstices between the detached masses of rock. The quartz thus fallen, and the earth between the blocks of quartz, were filled with gold; but the whole of it was what is called quartz gold; and is distinguished from washed gold by having a rough, scraggly appearance. These masses of quartz were covered with earth to the depth of about three feet, in which there was little or no gold; and this earth was stripped off and thrown down the hill-side. The defendants worked a narrow strip of ground, fifteen or twenty feet wide, and twenty or thirty feet long, on which these fallen masses of quartz were found. Some of the witnesses state, that they trailed the ledge distinctly as far as the defendants worked. For the gold taken by the defendants from the premises in dispute, this suit is brought.

There is no question as to the priority of the defendants' location. The only question is, whether by their location and claim the defendants became entitled to this loose quartz rock and decomposed material, which was once, if not now, a part of the quartz ledge. The view taken of this matter by the learned Judge below, strikes us as sensible and just. In his findings, he says: " It certainly would be a very great hardship to the quartz miner—he having priority of claim—to adopt the reasoning of plaintiffs' counsel, and confine the quartz miner to the solid quartz actually embedded in the solid bed rock. It is shown by the evidence, this, in many cases, is but a small proportion of the real value of the ledge. Where the ledge comes to the surface, there is always more or less detached quartz rock, and always more or less decomposed quartz. In most cases, this portion is more highly prized than the solid ledge itself; for this reason, that it requires far less labor and expense to prepare it for working than the same quantity of the

solid ledge, and oftentimes makes a much greater return in yield of gold.

" In this case, the portion of the quartz in action is described as having the appearance as if the quartz ledge had been pushed up through the crevice in the bed rock above the surface of the bed rock; that the portion thus exposed above the surface, had broken off and fallen down the hill. The ledge in the bed rock is about two feet in thickness, and the masses of quartz rock which had broken off and fallen down the hill, were of about the same thickness—many of them, at least. The witnesses, some of them who worked in the taking away of the rock and earth, say they could trace the general thickness of the ledge as far as they did work.

" It is argued by plaintiffs, that this doctrine would, by parity of reasoning, give to the defendants all the gold in the surface earth down as far as the ravine, a distance of four or five hundred feet, as it might be easily shown that all the gold in the surface earth had once been a portion of the ledge, and had become free gold by the decomposition of the quartz rock in which it had once been held. I think the reasoning could hardly reach to that extent; but would certainly give to the prior quartz miner all the gold in detached or decomposing quartz, so far as the general formation of the ledge could be traced. And I think it could make no difference whether the ledge had been thrown above the surface of the earth, and having fallen over, was laying flat upon the earth, or whether the ledge was still standing perpendicularly in the earth, or whether the ledge was still one solid mass of quartz rock, or had become entirely decomposed, and of no greater density than the ordinary earth around it. The Court is of opinion from the above, that the defendants are not shown to have worked beyond the limits of their ledge of quartz; and having priority of right in time, they were entitled so to work, and having the right, could peaceably remove the sluice-boxes thereon."

This principle, thus clearly stated and limited, gives the party appropriating a quartz lead the rights which, by his location, he evidently designed to take. It is a more simple rule than that invoked by the plaintiffs, and is calculated to prevent interference and litigation, and to ignore nice distinctions and subtle controversies, both as to rule and fact. Indeed, if the kind of quartz and the condition and quality of the rock in which it is, or in connection with which it be found, are to determine the right of the locator, it is scarcely possible to put a limit

to the number of questions, or the amount or extent of litigation to which the principle would give rise.   There is no reason in the nature of things why, as the right comes from appropriation, whenever the claim is defined, the appropriation should not as well take effect upon quartz in a decomposed state as in any other sort, or why the condition to which natural causes may have reduced the rock should give character to the title of the locator.   Nor can we perceive why the appropriation of the ledge is any the less entitled to respect, from the fact that the rock has been broken instead of remaining in solid mass.   The only question of fact was, whether this quartz rock, whether parted or not from its original connection, was a portion of the same quartz lode *or claim,* taken up by the defendants, and the Court seems to find, on evidence before it, that it was.   We think it not important whether it was upon the surface or beneath it, or in what condition the quartz was, if this were the true state of the case.

The custom of miners is entitled in these anomalous cases to great, if not controlling weight, and though the Court does not expressly find this custom, the evidence strongly confirms the view taken by the Judge below.

We do not think there is anything in the point that this testimony of custom in other districts was admitted improperly.   We are not convinced that this proof was not proper under the facts.   But the error, if one, was immaterial, as the case was tried by the Court, and the judgment placed on independent grounds, upon which it can stand.

Judgment affirmed.

After a rehearing of the case, the judgment was affirmed by a full Bench, for the reasons given in the foregoing opinion.